Subscriber assigned ID address 73.18.154.14 Mr. Banlow, the appellant, Mr. Boyd, the appellant, in support of the district court's order. Good morning and may it please the court. My name is Lincoln Banlow and I represent the appellant, Strike 3 Holdings, LLC. I reserve three minutes for rebuttal. With me at council table are Emily Kennedy, the general counsel of General Media Systems, the parent company of Strike 3, as well as Jessica Fernandez, senior counsel for General Media Systems. They were both on the briefs and are admitted here in D.C. I'd like to spend a brief moment talking about three things, the nature of my client's business, the nature of our lawsuits, and the errors that were made by the district court in denying us a fundamental step towards the process of enforcing our copyrights. First, my client is a motion picture production company. It produces, it writes, produces, directs, edits, etc. It's in the business of licensing and selling its adult films that it produces. These are very popular films with a large subscriber base, but unfortunately that popularity is also evidenced by the fact there are a lot of people who'd rather steal the films than pay for them, so they use the BitTorrent protocol to do so. And they do so at an astronomical rate. Our investigators tell us that there are over 400,000 unique infringers of our content each month. And so we, like many other content creators, mainstream films, book publishers, record companies, etc., software creators, we have decided that it's important to protect our rights and do so through pursuing these online infringers with litigation. This litigation, though, is different than most litigations. Most litigations you know exactly who your defendant is. There may be a little dispute over liability, but your picture is posted to a website, you know who did it, you can go right after them. But because of how the Internet works, these people are anonymous, at least temporarily. But Congress has specifically addressed the issue of whether they can always remain anonymous and has said very clearly, under circumstances in which a party shows good cause, you can obtain a court order requiring an ISP to provide you the name and address of who is that person behind that anonymous number. You don't dispute the good causes of the test that you think should apply to get this, what you all call, early discovery? Absolutely, and we don't dispute, in fact, the district court did not dispute that the proper test is the Arista case. And so using that test, we need to seek court intervention to get the information to proceed further in our cases by giving us that order. But what we do before we bring any case is we do a substantial investigation that reveals three important things for this court. First, we don't go after everybody of those 400,000. We only go after the very serial significant infringers. So our investigators first uncover someone who is infringing a lot of our works, not one, one day, but in this case, 22. In this case, it actually relatively is a low one, 50, 100, 200 of our films. And we also uncover evidence that they're doing it over an extended period of time, three, five, six months, a long period of time. And the third thing we have before we file a lawsuit is we have that number so we can tie it to a database that talks about their entire BitTorrent history. Every motion picture, video game, book, song recording that they're using BitTorrent to infringe, we're aware of. So what we have is a massive serial infringer. So, Counselor, you agree that the standard here is abusive discretion? It is abusive discretion, certainly, but— So how do we get past that? Well, there were— A deferential standard of review. There were three ways that discretion was abused. First of all, the court, although recognizing that the ERISTA test is the appropriate test, a very persuasive one, as the court said— That test hasn't been adopted by this circuit. I'm sorry, excuse me? The ERISTA standard is a Second Circuit case. That's correct, but every district court in this district that has looked at these motions has applied the ERISTA test or otherwise seen the factors in ERISTA indicate the kind of good cause factors that you should look at. The court did three things that are abusive discretion. First, it substantially revised certain aspects of the ERISTA test to make it such that it would be impossible for us to obtain the very important, necessary information, information the court deemed itself to be necessary, to proceed with our cases. The second error in abusive discretion was it didn't say everybody would have that impossibility. It said only us because we're producers of adult content. It said other producers of mainstream content or what have you would somehow be able to meet this test, even though we somehow could not meet the test. And it did so on the basis, which is an abusive discretion, of discriminating against us based on our content. It pretty very clearly said I'm not giving you this relief you request because of the content of your speech. The third error that's abusive discretion, and a clear one I think under this court's precedent, was conducting an extrajudicial investigation. We put before the court very specific facts, things like our policy in these cases, specific declarations that we don't want to proceed against innocent people. We try very carefully to get all the evidence we can to make sure we're not doing that. And despite the fact that those were the undisputed facts before the record, the court went out and did its own investigation, looked at a highly disputed prejudicial law review article, looked at some old article about a lawsuit against a grandmother somewhere done years ago before we ever got into this litigation, and other bits of information to make several conclusions about what we supposedly do in this litigation that there was no evidence to support. And it admitted, it said things like Google at your own risk, meaning he went out and Googled and looked at some things. We're not sure exactly what it was. This actual legal ruling here, the legal basis given for his ruling, didn't factor that information. I'm sorry, what? Its actual legal ruling here, the basis for its decision, did not factor in the extracurricular research. Well, I believe it did factor in that extracurricular research because it said that, again, a quote-unquote honest copyright holder won't have to worry about this because an honest copyright holder doesn't do such things as engage in a high-stakes shakedown and an extortionate plan and use the court as an ATM. Those were all statements that parallel what was said in that article. If you look at that article, you see those exact statements are made. There's no basis for those statements other than the article. Is the court saying, I'm looking at page 7 of this decision, that you lack the required specificity because oftentimes the person that's identified is not the one doing the infringing, that was its rationale, and that you have a higher, in talking about the nature of the videos here, that was the basis for it. I don't think some of the language, but the nature of these videos, the basis the district court found would trigger maybe a privacy interest that might be different from copyright cases that don't involve pornographic materials. And so you have the risk of misidentification and the heightened privacy interest, and that seemed to be what the district court was balancing, which I think is distinct from them. I credit your point about some of the things the district court was saying, but we're here reviewing not opinions, but holdings. Sure. So I think there's three things I want to address, all of them. First, his look at the quote-unquote specificity requirement. He turned that into something that it's not. The specificity requirement is just simply, have you been specific as to the exact thing you're asking for? And we, in this case, can't be more specific. We asked for the name of a person on a particular date, time, hour, minute, and second. So we're very specific about what we've asked for. He translated that into a requirement that we sort of prove our prima facie case right now as we ask for the discovery, which is, as other courts have said, is sort of circular. We have to get this discovery to proceed further, and he's saying, no, you should know exactly who it is before you can proceed further, and we simply can't do that. And every single BitTorrent case that you would look at, every single party has always agreed there's no other way you can get this information than using this process, and there's no otherwise way we can figure out who the exact person is. So that was the one error, was turning that into that problem. Yes, Your Honor. No, no, please go ahead. And then the second thing that you said was the risk of misidentification. That's really not the standard, and not the standard that any court has applied, and there have been 17 district court judges here in D.C. that have not applied that standard, and there's been 325 judges across the country that have not applied that standard in these cases, because what that requires is that you prove that there's no possible other alternative to your theory of liability, and that just simply turns Iqbal Twombly on its head. That's not what we're required to do. Yes, there's a possibility it is not the exact subscriber, but that's not the test. The test is, is it plausible that it's the subscriber? What if it comes back from, here it was Comcast or Verizon or whomever, that the IP subscriber is a library? What happens then? Do you still claim to have a plausible inference that the library or the chief librarian is the one that did it? So that very rarely happens, since it does happen in our cases where it's a Starbucks or it's a library or things of that nature. At that point, we would not be able to proceed under Cobbler and say, oh, whoever administers that at the library must be responsible. We would have to then take that information and provide something more to the court to amend and proceed further. In that circumstance, we would realize it's probably going to be very difficult to figure out who of the countless people walking through Starbucks or the library did this. We would immediately dismiss. That case would be over. It's one of the reasons why a lot of these cases, some of them, not a lot for this reason, but they winnow down from the process of getting the name to the process of resolution of the case. One of those reasons is that. Well, the amicus found a quote from, I don't know if it was you personally, but for your client in a District of New Jersey case in which the quote was that it is often that the subscriber to the IP address is not the one who is suspected of infringing because there's libraries, Starbucks, or parents, or people in a house that don't have a secure password and the whole neighborhood can be using it. And so what do we do with that word often? It's not the subscriber who is the one that you suspect of infringing. I have to look back. I was at that hearing along with my clients who testified at that hearing to see if we used that word. But now we know. I can read it to you. There are often going to be circumstances in which mom is the subscriber on it, but it's dad or adult son or something of that nature that's actually doing the infringing. Obviously, it's the word often. It's a poor choice of words because what we have found in our litigations is because we have done a substantial number over these years, when we amend our complaints and proceed further after we've gotten the name, our data shows that approximately 75% of the time we end up proceeding against the subscriber. And the other 25%, it was somebody in the house. So it really actually isn't often in the extents of it's the majority of the time. It's seldom. 75% of the time, we were right. It was the subscriber. And again, that's what I talked about at the beginning. What we have is someone that's infringing a lot of works over a long period of time, so it becomes more plausible. It's already plausible, but it becomes more plausible that it is the subscriber because it's someone with really consistent, repeated access to the account, which is more likely the subscriber. But we recognize that it may be somebody else, particularly somebody else in the house, and that's why we need that information. We don't, maybe there's a misconception that we get that name and address and we just immediately slap it onto amended complaint and off we're running. We don't. We take that information and conduct a substantial further investigation to make sure that that information helps us tie it to either the subscriber or on occasion, get away from that often word, On occasion, we find out, oh no, it's the 25-year-old son that lives at home. It's pretty clear. From the information we can glean from readily available public sources. We have cases where we get the name and address and we can look and we found somebody who's tweeted, love your content, do more works with these particular talent, et cetera. It's clearly that they are somebody that likes our works and there's reason to believe they're the ones that have infringed. So we do a substantial further investigation, and we obviously can't. We can't serve the claim, we can't do that investigation unless we at least get this very simple basic information. Are you able when you, I just don't have any idea, to first ask the internet service provider if the account is a private sort of individual account or a business or some sort of large group, Starbucks something, library something like that? Is that possible for them to answer in the first instance or not? Theoretically, they could. Why wouldn't that be a better first cut? So then you're immediately going to knock out the Starbucks, the apartment-wide provision of service, the libraries. Because we're going to immediately do that anyway. We are going to immediately do that. If we get back, it's Starbucks, it's a local B&B, it's a library. We're already going to immediately do that. That case is going to get dismissed. Again, it doesn't mean there isn't an infringer somewhere. It means our infringement is going to just be un-remedied. For example, if it's a Starbucks, again, that amount of infringement over a long period of time from the same number, it probably isn't someone wandering in and having a latte in some infringement. It's probably a barista in the back room using the Wi-Fi. But that's okay. That's very difficult to prove, time-consuming, burdensome on the courts. That gets dismissed right away. But certainly, yeah, I guess you could have a court order that says, tell us first if it's a business, and if not, we'll go from there. But technically, that's going to save a nanosecond of time. We see it's a business, case is done. Now, I want to go back to your point about the privacy balancing that he did. His privacy analysis was based really on one case, this circuit's medical records case. And you really can't find a case that's more off-point than that one because it was a very different thing that was being balanced there. In that case, there was a subpoena to get a mentally retarded man's entire file in connection with a lawsuit for assault against him by other mentally retarded men at the hospital. They asked for his entire file. And the court said, wait a minute, that's going to include his notes and his conversations with his therapist. That's absolutely privilege. When you balance absolute privilege, that's it. That's the end of the balancing. You don't get that information. That's the nature of absolute privilege, is you don't do balancing. You say, that's attorney-client, that's doctor-patient, we're done. We don't have that here. First of all, we have a somewhat weaker privacy interest here. Although we acknowledge it, we always agree to protective orders, we want protective orders for ourselves to protect us, which I can talk about. But in particular, we don't ever dispute it. We always ask for it. They're always granted. But more importantly than that, we don't know in every case somebody has a privacy interest. They may have no problem with the world knowing whatever content it is they enjoy. So we don't know in every case. Second of all, there is a lessened privacy interest in theft. I recognize that what you and I, when we go home and decide to watch, it should be something private that we get to keep to ourselves. But we don't get to go steal things and keep it private. And Congress has said so. That's why they've given us this right under the Communications Act to subpoena ISP. If we find that there's theft, there's a lessened expectation of privacy because every single ISP gives you terms of use. And what does it say? If you use our service to steal stuff, we're going to have to reveal you maybe in a court process. So you know going into engaging in BitTorrent activity that your activity may be revealed. Not withstanding that. But don't those contracts say that if someone else uses your ISP, we're going to reveal your name? I think it just says— You're leaping a step. The privacy interest is, or the concern is, that you may offend someone who has the address, but is not the infringer. A hundred percent agree. Your argument now isn't making any sense because you're avoiding that issue. That's the issue. Well, that's assuming that we've got the wrong person, which is an assumption. And assuming that's correct, that's why we're perfectly fine with protective orders in every single one of these cases. Before there's even a defendant involved, we suggest a protective order. We do it because we recognize— A normal protective order. What are the details of a protective order? The details typically of the protective orders that get entered around the country are, A, the defendant can remain anonymous throughout the litigation. B, we can only use the information we obtain to further prosecute our actions. We can't use it for any other purpose. C, it's to remain confidential with us, which we always agree to. And those are the basic provisions of a confidentiality order. So, we don't release names. Names aren't out there. There's a statement in the opinion about how, oh, you'll Google someone and you'll immediately associate them with these lawsuits and this content. No, you can't do that right now because no, that won't happen. So, that balancing, you've got on the one hand the heaviest weight you can. Without this, we're done. Without this, we literally cannot enforce our copyrights. That's one end of the balance. The other balance is, maybe this could be embarrassing to someone, but you can address it. Give them a protective order. That problem is solved. Again, I agree with Judge Edwards. I think you're watering down the whole reason even ERISTA developed its test, is that there are First Amendment concerns here, and you opened by describing your research that you do before you do this, and it shows you look over a period of time not just at your images, but what else are they looking at? And so, you've got a three, 12-month record of what someone at ISP address has watched. And now, we're going to use court processes to expose that. And so, that seems to me, and you say theft, but as you said, whether often or not, there's a material percentage here where the person's not going to be the one who's done anything wrong. And so, we'll have full-throated First Amendment protection against analysis in a courtroom of the things they watched. In the privacy of their home. Well, bear in mind, if they were the person that didn't do it, we're not revealing anything that they watched or downloaded because they didn't do it. So, the... You take at face value every denial? You take at face value every denial? You say, I'm not the one that did it? We take serious denials with an offer to provide information to support the denials very seriously. Every single one. Now, look, it is... There are some occasions in which it seems pretty clear the defendant said to his lawyer, let's settle this. Tell him I didn't do it, but let's work it out. And that's a denial. But when somebody's more serious and says, I did not do this. In fact, I have evidence I can readily produce to you that would show it. Our first response is, give it to me. And in fact, our first response is, I don't want to settle with you. I don't want a penny from you.  And we'll dismiss. We're very careful about these actions, and that's important to understand. There's bad actors in the past that have done all kinds of bad things in these litigations. But primarily, those bad actors weren't companies. They were just people acquiring old works for the purposes of suing. We're a real company with a real reputation and a real brand. We don't want to be the company that sues innocent people, that hassles people, et cetera. That would be bad for our reputation as a company. We want to just simply enforce our rights and stop what is a massive problem for our company. Are the remedies usually monetary? I'm sorry, what? Are the settlements usually monetary? Not always monetary. There's two things we really want. We want some compensation for the harm to us, but we want the infringement to stop. And the one thing we found is, once that ISP notice goes out, it stops. So there are a lot of times where we dismiss without any sort of payment, because we're happy with the fact that it stopped. And it's important that it stops, because these are not just downloaders. They're distributors. They're helping this continue to be distributed on a daily basis, and we really want that to be stopped. I see a lot of time. Thank you. May it please the Court. Seth Lloyd for Court Appointed Amicus. The District Court acted well within its broad discretion in denying discovery on the facts here. Stripe 3's request creates a significant risk of misidentification, because Stripe 3 admits knowing only that someone allegedly used an Internet address to commit copyright infringement without knowing who that someone is. That risk of misidentification threatens real harm to Internet subscribers, and Stripe 3 has a pattern of pursuing discovery like this with little interest in seeking judicial resolution. You think the District Court would have been similarly concerned if we were talking about infringing children's rights? I think the balance may well have been different in that context, Judge Edwards, because of what the District Court identified, that when the content is sensitive adult content, the privacy interests are different. You mean that content is discrimination? No, it's not. I don't get that. The District Court seemed to weigh very heavily the fact that this was, in his view, a porn site, which he had a little good taste for. And, you know, the first thing as I'm reading the cases was both it's children's books. That's what you're talking about. Because the risk of identifying someone who is not the infringer of the children's books is the same. And there may be embarrassment caused to the person you've identified in the same way you're talking. The only addition to the equation is this is porn sites, the other is children's books. And if what the District Court is resting on is the fact that they're porn sites, which he has no use for, that seems to me very iffy as a basis for... And if you're readily agreeing that it's going to be different if it's children's books, then I'm not sure that discretion was not abused. It's different, but it's not different because of the content. It's different because of the effects that that content has on people's privacy interests. And that's consistent with Supreme Court precedent. Well, I think there are lots of people if they're stealing children's books who would be mortified that someone now is accusing them of having done it. And they would not want that known. And I don't know how to weigh that against those who would be mortified if someone found out that they were looking at porn use in whatever these movies are. So it's fair for courts to consider the privacy effects, including the secondary effects of the content. So if there may be concerns like that for children's books, then that would be something the District Court could balance, just as the District Court here could balance the fact that the adult content is sensitive. Wouldn't it be a troubling line to have courts factor into whether you get this type of upfront early discovery subpoena social judgments about the worth of the content that's being infringed? That would be a troubling line, but that's not what happened here. Okay, how is that not exactly what happened here? The District Court didn't do anything different, ultimately, I don't think, from what Strike 3 itself said. Strike 3's filings recognize that the sensitive nature of this litigation has the potential to embarrass and humiliate people and to force innocent individuals to settle. That's what Strike 3 said in its filings. And that's, I think, the privacy interests of the District Court. Well, it made this bill reacting to exactly this problem that courts maybe are sure... I mean, it's one thing if the person on the receiving end... It's the ISP, but the person the ISP is identifying wants a protective order for whatever reason they articulate. Courts can deal with that. But that's a different thing, right? That happens all the time. People can explain why they need a protective order. And that's really coming out of their mouths. It's not a content-based upfront judgment like we have here, which is before I know whether one even wants a protective order or anyone's embarrassed, I'm going to look at the content of your material and decide that it's harder for you to get this discovery against infringement than, say, Disney for... I'm guessing that there's probably theft of Frozen. I think the District Court rightly looked at the effects that this could have on subscribers, just as this court did in AF Holdings. The court in AF Holdings recognized that the adult nature of this content combined with the high risk of statutory damages and the cost of litigation placed burdens on the absent individuals and that courts could properly consider those. And the Supreme Court has... So just on the First Amendment point, the Supreme Court has repeatedly said it's content-neutral when you have a regulation, for example, that says an adult film theater cannot be located near residential areas, but non-adult film theaters can. And the reason the court said that that's a content-neutral regulation that can survive First Amendment scrutiny is because what you're concerned about is the secondary effects of the content on those around them. But a regulation or a statute is something very different from a single District Court judge exercising their discretion, right? I mean, if you have a law or regulation that's been implemented through some process, that's very different from exercising your discretion over the type of content that determines a privacy interest. I think that's different, but at the end of the day, I don't think the law requires District Courts to blind themselves to the privacy interests that are at stake. This Court referred to the same thing in Ant Holdings, and that's all the District Court did here. But again, the privacy interest... Sorry, I didn't... The privacy interest is just one part of the balancing that the District Court applied here. I don't think the District Court committed an error of law in considering that, and the other factors the District Court considered also weighed heavily. What if it was violent conduct? Could they do the same thing if it was videos of violent conduct? If the District Court is concerned, and there's evidence, as I think Ant Holdings suggests there is, that parties are using that type of content to put pressure on unnamed subscribers to settle cases regardless of the merits of them, then that may be a factor that District Courts can consider. Is there some evidence to indicate that that's what's going on? They're using this to put pressure on people who don't want to settle? Where is that coming from? That's the concern that this Court identified in Ant Holdings, where it faces a similar pattern of conduct. This is a particular case. Is there some evidence to support that? I think it's the same difference... Were they allowed to address the concerns that the District Court raised having looked at these newspaper articles, etc.? Did they get a shot at that? I think... It's not your fault. I'm just asking to kind of get a sense of what your argument is. Abuse of discretion doesn't allow or doesn't embrace whimsical decision-making. I'm not entirely sure what lines are being drawn here by the District Court. I'm unhappy because... Why? Why are you unhappy? Is it because of the nature of the site? I don't get that, quite honestly. And now you're suggesting it's because maybe these people used this to just go out and leverage innocent people. Is there something to support that? Yes, I think... Other than the newspaper articles that the judge read and that were not the subject of the hearing? Yes, I think there is. At first, I think it's important to be clear the District Court didn't adopt any bright-line rules. It didn't draw any lines in the sand. It did a multi-factor balancing test, which is what courts are supposed to do when they exercise discretion in this context. And if you read the decision as a whole, I think what the District Court was concerned about... For one, the District Court started by calling Strike 3's content award-winning and critically acclaimed. I think the District Court had a balanced view of what was happening here but found concerns. Those concerns aren't just the nature of the content. It's the pattern and practice of filing thousands of these suits, 1,849 suits, in a 13-month span and not being able to point to a single one that proceeded, not even just to a trial, but to a judicial resolution. And in this court, when Strike 3 had the opportunity to show that it is seeking discovery here to pursue cases in court, what did it point to? It pointed to the case we submitted a couple weeks ago from the Western District of Washington where, when a John Doe defendant filed counterclaims, Strike 3 promptly dismissed its own claims and tried to prevent the District Court from deciding the case. I think that shows a pattern in the District Court who has 30 years of experience overseeing litigation could at least reasonably infer that there's a pattern here of filing these cases to get the discovery and pursue settlements but preventing courts, actively preventing courts from reaching the merits that there is no... Go ahead. How does the legal test that the District Court adopted here, which focuses on the salacious, makes an express fact of the salacious nature of the material, how does it protect against the concerns you were raising about filing lots of lawsuits and dismissing them? I think the District Court simply considered a variety of factors in determining whether to exercise its discretion. The privacy interests of the absent subscriber was one of those factors. I think the pattern in practice of litigation conduct is another because it shows the question that this court asked and looked at in A.F. Holdings. Is the party seeking discovery to pursue litigation in court? Are they exercising or asking for the help of the court to actually do what discovery is for or are they doing it for another reason? This is sort of a strange position procedurally. We're at the complaint stage but it's almost like the half complaint because it hasn't even been served yet and we don't even know the defendant on the receiving end of the complaint. Normally we would expect District Courts to construe the complaint in favor of the plaintiff and make all reasonable inferences in their favor before doing what the District Court recognized here which is denying them the discovery which means dismissing your case. The two go hand in hand here. On the other hand it is an unusual time that you're authorizing a form of discovery. It's ex parte. There's no defendant here. There's genuine concerns but it seems to me how far can District Courts go when finding their own facts about what's going on and not taking confining themselves to the complaint in this context? Is there a rule for that that you identify in the decision? I don't read the decision here as finding any facts that weren't either already that weren't part of the allegations in the complaint part of the motion or aren't sort of readily discoverable facts from Pacer filings. So the District Court's looking at Strike 3's pattern of litigation conduct. I think those are the only facts  the District Court's decision and I think those are proper things to consider. Well I think the problem is as I read it the District Court did more than simply say you filed lots of cases because there's lots of infringement and that would be the reasonable inference from that and then saying the case is ended but I thought the District Court was going further particularly with the people saying that they ended because and here's the facts they don't want to litigate they cut and run they're sort of abusing the process. Those seem to me like additional fact findings that are anything but judicially noticeable from Pacer. I think those are inferences that the District Court from the undisputed facts about Strike 3's pattern of litigation conduct across 1,849 cases I think the District Court can... That's my question that normally we take reasonable inferences at this stage in favor of the plaintiff not against the plaintiff. Are you telling me the only inference that can be drawn from lots of filings and then cases that settle or some that are dropped the only inference that can be drawn is that it's abusive litigation? The only reasonable inference that can be drawn? I don't think I don't think that's I don't think the Court has to conclude that that's the only reasonable inference. I think we have to to credit it don't we because otherwise we have to take the reason there's a reasonable inference that goes another direction don't we not have to take that at this stage in favor? No, I don't think so and I think A.F. Holdings shows that that's not the case and A.F. Holdings again there was a similar pattern of litigation practice filing hundreds of suits getting discovery getting the name and then promptly dismissing the suits and this Court drew the inference that the pattern and practice there was that you're seeking this discovery for reasons unrelated to pursuing your claims in court and we courts don't are not compelled to lend their imprimatur to that type of practice and that I think it's important to realize or remember you know what Strike Three is seeking here is the Bright Line Rule that any time a copyright owner files this form complaint with this form motion district courts have to grant this discovery and not granting it would be an abuse of discretion that's not the type of discretionary practice that the rules contemplate and that's contrary to what Congress expected the reason Strike Three suggests there's a technological problem that prevents it from getting the subscriber's name it's not the internet provider knows who this person is but Congress wanted that information protected and wanted courts to act as a check against abuses and that's what the district court did it weighed the factors it applied a multi-factor balancing and exercised appropriate discretion so what more are they supposed to show I mean so under this theory the district court's approach I don't know how any of these actions will ever go forward so it seems although it had more words and factors it seems like at the end of the day it's also it's another bright line test going the other direction what more could they show without first identifying the plaintiff that would that would meet the I mean the clobber test was not at this stage they'd actually had given them the subpoena it was at the beginning of the case or would they be able to show or should they show to get the subpoena I think they should show that they're seeking the discovery because they actually intend to pursue claims on the merits including if defendants fight back well wouldn't it be a little troubling if based on the content of their movies we said you have to commit to litigating further in court than we require of other parties no but I think the interference when there are 1,849 cases and you can't point to a single one I think it's it may in fact be sort of unreasonable to infer I think that every single one of those parties either settled except the district court's view about privacy concerns then people might very well be willing to settle and they've got you know they do have once they find the name that goes with the IP address unless that person can say I didn't do it then they've got the evidence already of the infringement and so it may well be there's not much of a defense on the other side I mean that's the thing where I have no idea why these things are ending it could be for a whole variety of reasons it could be Starbucks libraries it could be you've got me and I don't want how do we how do we know from this record without the district court's surmise that it was their decision to stop as opposed to the defendant's well I think we're not in complete darkness here I think the case we submitted a couple weeks ago from the western district of Washington shows in fact that when people fight back strike three does cut it no it shows us in one case that's what happened but strike three out of thousands of cases can't tell me I'm sorry have we looked at the 1,848 cases and found that in every one of those someone pushed back and they cut and ran or do we know that I assume you're not going to we're grateful to your work for the court as amicus but I assume you haven't looked at all 1,849 cases to figure out whether maybe you know defendants wanted to settle or not you can tell any of that from pacer anyhow no I haven't looked at the 1,000 cases but strike three was involved in those 1,000 cases and when it had the opportunity in this court to point to cases where defendants have fought back and it continued instead it pointed to footnote seven the case it points to the district court again this is I think exactly the type of thing that district courts are well qualified to weigh because they at this stage yes in terms of a pattern or practice of litigation and why parties are seeking discovery just the nature of this I mean you know there's widespread infringement but each individual claim may not be that important to the individual case so they pursue what they can and let go of the others why isn't that a possible explanation of the many lawsuits because we don't invoke the machinery of courts unless your purpose is to use that machinery to pursue things private parties start lawsuits and then go to settlement I don't know what percentage of cases settled but I assume it's a large percentage in all cases that's right but we typically require private parties to have a plausible claim before they get into court so that's a different argument that they don't have a plausible claim I think the name may not well they know that somebody is infringing because they know that people are illegally downloading so they know there's been an infringement of their copyright they don't know who did it but they know that such an infringement has occurred so that's not speculative they know that somebody is misusing the copyright that's right but under Twombly and Iqbal that doesn't usually open the court doors to discovery under Twombly and Iqbal you have to have a plausible claim against the defendant that you're suing in court and we understand and the district court has a multi unit IP address or Starbucks or anything like that so it's a house why isn't it plausible that the subscriber that owns this account did it assume there's four people in the house is it 25% not plausible I think that probably wouldn't be plausible under the Supreme Court when there's alternative obvious explanations the alternative obvious explanation has to negate the other one this is like four people shot the gun at once and we don't know which one hit the person but I don't  it's plausible I think I would disagree I don't think it's plausible to say that all four of them could be sued in court simultaneously because the allegation is that only one of them did it and so if it's more likely that it's one of the other three there's a computer in a house that four people have access to it's undisputed that all four of them have access to using it and maybe even use it sometimes child pornography is found on that computer is it true that a court would say you don't have probable cause to arrest the owner so is there not probable cause to arrest the owner or maybe arrest all four people would that not be probable cause I'm just going to go with the owner I think that probably would be probable cause and possibility is higher than probable cause possibility is not but again here you don't even know how many devices there are and even in your hypothetical if you have a situation where ten different people share the computer that may be that would be a factor I think you would want to weigh in the analysis if the district court's rule were adopted and none of us can think of what more they could show at this stage because we're not going to make people take a blood oath to litigate to the very end then isn't there another consequence if courts adopt a rule that says nothing you can do to stop this infringement won't the infringement go through the roof you have to worry about that two responses I don't think the district court adopted a rule and the court in affirming wouldn't be endorsing a rule that says you can never get discovery in cases that involve whatever the district court thinks is salacious there's a rule you have to come back with more you don't think they could come back on another day and get a subpoena from the same   district   says you can't get discovery at all costs what I'm saying is when there's a pattern of filing thousands of cases and you're unable to point to any case where you fought back against a defendant who is resisting your charges then I think a district court is             a subpoena from the district court says you can't get discovery at all costs what I'm saying is when there's a pattern of filing  cases and you're unable against   your charges then I think a  court says you can't to any case where  against your charges then filing cases and you're  to point to
judges: Millett, Rao, Edwards